## Vinaird et al. v. Bodkin's Administratrix.

(Decided June 12, 1934.)

.842

M. C. ANDERSON and MARTIN & ROBERTS for appellants.
WHEELER, WHEELER & SHELBOURNE for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

Donvin and Joe B. Du Poyster, on the 15th day of April, 1924, by a writing duly executed and delivered, conveyed to Ike Bodkin "all of the timber on a certain tract of land lying and being in Ballard and Carlisle Counties, Kentucky, known as the Fort Jefferson land and being the same land willed to the grantors by their grandmother, R. S. Du Poyster, lying south of the Logan line in the division of the Jacob Myers Treasury Warrant Survey," with this provision:

"The timber sold and conveyed on this tract of land shall be all the timber lying at the bottom and south of the foot of the hill. No timber in the hills is conveyed by this contract."

Bodkin took possession of the land for the purpose of cutting and removing the timber covered by the contract. He continued to cut and remove it until the 6th day of October, 1930, when he entered into a written contract with W. L. Vinaird by which he sold him "all the timber, logs and trees, except the locust and mulberry, standing, lying and located on tract of land in Carlisle and Ballard Counties, Kentucky, known as the Du Poyster land, containing about two thousand (2,000) acres, more or less, and known as the Fort Jefferson tract, and being the same land which was willed to Donvin and Joe B. DuPoyster by their grandmother, R. S. DuPoyster, lying south of the Logan line in the division

of Jacob Myers Treasury Warrant Survey." His deed contained this clause:

"The timber sold and conveyed herein was conveyed to grantor, Ike Bodkin, by written deed and contract from Donvin and Joe B. DuPoyster, dated April 15th, 1924, and is of record in the office of the Clerk of the Ballard County Court. * * *"

By the contract, Bodkin sold him "a steam sawmill together with all the equipment and apparatus attached therewith, situated on the tract of land above described and is known as the Ike Bodkin sawmill." It reserved the timber growing on 180 acres of the land on the east side of the right of way of the I. C. Railroad Company.

J. P. Edwards was the father-in-law of Joe B. Du Poyster, and had been for years the "manager of the DuPoyster heirs," and looked after the timber; conducted the negotiations with, and completed the sale to Bodkin. After the sale of the timber to Bodkin, Edwards continued in charge of the hill land and timber reserved in the Du Poysters' deed to Bodkin. At the time of the sale to Bodkin, no sawmill was located on either the bottom or the hill land. As the consideration for the timber, Bodkin agreed to pay the $3,000 and build two 4-room cottages on the land. On account of the water necessary to operate a sawmill, Edwards agreed for Bodkin to locate a sawmill on the hill land or that portion of the Du Poyster land on which Bodkin did not purchase the timber. With the consent of Edwards, acting as manager for the Du Poyster heirs, Bodkin erected a building in which to house his sawmill, and built one of the two 4-room cottages he agreed to build on the Du Poyster tract, both of which he thereafter used until he sold out to Vinaird.

Before the trade between Bodkin and Vinaird was completed, in company with Forrest Flournoy, they went upon the land and examined the timber which Bodkin was proposing to sell to Vinaird. At that time Bodkin represented to Vinaird that he owned and was selling "all the timber south of the Logan line"; the Logan line being the north line of the Du Poyster tract. At that time Bodkin was under contract with Ballard county to furnish it, at $25 per thousand, 20,000 feet of bridge lumber. He proposed that, if they traded, for Vinaird to fill the order, Bodkin giving him credit therefor on the purchase price. They agreed on $3,000 as a

value of the timber on the hill land; $2,000 for the timber on the "bottom land"; and $1,000 for the mill shed and cottage and the sawmill; the mill being priced by Bodkin to Vinaird at $550, the cottage at $200, the mill shed at $250. The total agreed consideration was $6,000, for which Vinaird executed and delivered to Bodkin his note, payable as set out in the written contract between them. The contract included a precipitating clause authorizing Bodkin to declare the notes evidencing the consideration, due and collectable on default of payment of any one of them at maturity. Their contract embraced these provisions:

> "The party of the second part [Vinaird] shall have the peaceable possession of the land as above described, subject to the terms and conditions of this contract during the life thereof. * * * Second party shall not cut for Ike Bodkin, on his account, any timber except according to a written order containing the dimensions, number of feet and price per thousand, and which order shall be signed by Ike Bodkin."

Vinaird took possession of the sawmill, the mill shed, and the 4-room cottage used by Bodkin in connection therewith while he operated the sawmill, and began to cut and remove the timber from the "bottom land."

Prior to his sale to Vinaird, Bodkin had entered into a written contract with the Kentucky Utilities Company, authorizing it to construct a transmission line on and over the Du Poyster land, including the hill land. And, after he entered into the contract of the sale with Vinaird, the utilities company, with Bodkin's consent, widened its right of way by cutting and removing the timber therefrom. For the timber cut and removed by it to widen its right of way, it paid him $100, of which he paid Edwards $25, and repeatedly stated to disinterested persons that the money he had received for the timber cut and removed when the right of way of the utilities company was widened belonged to Vinaird, and that he would give Vinaird credit therefor on the purchase-money notes executed and delivered by him to Bodkir

Under his purchase of Bodkin, Vinaird entered upon the land known in the record as the "bottom land," and began to cut, manufacture, and sell the timber. He

manufactured and delivered to the county the bridge timber as he agreed with Bodkin he would do. He and Bodkin agreed that Vinaird would manufacture and deliver to Bodkin cypress boards. Of these, he manufactured 6,828, which were hauled and delivered to Bodkin by Wilson Hames. He also cut and delivered lumber to Bodkin on the place "where Abernathy lives," which was used by Bodkin. By the testimony of Flournoy, Vinaird agreed to manufacture 20,000 boards at $1.50 a hundred and deliver them to Bodkin "where Abernathy lives." Flournoy says that of the number contracted 6,000 were manufactured and logs were cut in board lengths to manufacture other boards. Bert Smith, a witness for the estate of Ike Bodkin, testified:

"Vinaird and Bodkin were standing on the street and they called me [Smith] and I went where they were and Mr. Bodkin said what are you doing and I said nothing; he said do you want to cut some timber and I said yes I would like a job and he said Mr. Vinaird you hire this man he knows what logs I want for this box stuff and all the logs he cuts I will take them."

Smith was further asked and answered thus:

"Q. Did Mr. Bodkin buy any maple logs from Mr. Vinaird after Mr. Bodkin sold him that land? A. Yes, sir.

"Q. How much did he agree to take? A. I never did hear Mr. Bodkin say how much he was to give.

"Q. How many thousand feet was he to take? A. I didn't hear anything about how many thousand feet in the contract Mr. Bodkin and Vinaird went into. Nothing was mentioned about how many feet he was to take or what he was to pay for it. You understand what I was cutting of that timber on that piece of land on the DuPoyster land I was cutting good maple and Mr. Bodkin would take that from Mr. Vinaird, but I didn't hear the price. Of course, none of us knew how much or nothing was said about the number of feet.

"Q. Do you tell the Court Mr. Bodkin agreed to take whatever amount of maple timber that met his requirements? A. The way I understood it Mr.

Bodkin called me and asked me if I wanted to cut some timber. * * *

"Q. What did he say about the gum logs? A. This box timber was not supposed to be just gum or just maple. It was supposed to be logs sixteen inches or better gum or maple, with not over two knots. * * *

"Q. Mr. Bodkin did agree with Mr. Vinaird to take whatever gum and maple down on that place that met his requirement? A. That was my understanding. * * *

"Q. When was the contract made you say you heard about? A. It was sometime about the first part of January or February 1931. Just a while before Mr. Bodkin killed himself. * * *

"Q. Where were they [the gum and maple logs] delivered? A. At the DuPoyster spur. * * *

"Q. You think you cut around 30,000 feet? A. That is what I think I cut that would go to Mr. Bodkin. * * *

"Q. What was the difference in the character of timber in the bottom and the timber on the hill? A. There was a right smart difference in the grade of timber. * * *

"Q. You think the logs that met the requirement of Mr. Bodkin run around 40,000 or 50,000 feet? A. Yes, sir.

"Q. You say you cut 30,000 feet? A. Yes, sir."

This witness testified he had cut timber on the land while Bodkin operated the mill, a quarter of a mile from the Logan line. He cut it from 200 to 300 yards up the hill above the mill; a portion of it for Edwards and the remainder for Bodkin. He further testified that before Bodkin purchased the timber "quite a number of people had cut timber on the bottom land." They were cutting it when he was a boy. He made this statement:

"I don't believe I ever remember a time since I was a boy that there wasn't a sawmill somewhere on the DuPoyster land. They wasn't cutting all the time but when the weather would permit they was. I think there has been a mill running there

ever since I can remember. * * * That is what I call 'cut over land.' "

George Cruze testified that Vinaird manufactured boards for Bodkin; and Bodkin stated they belonged to him; also he had purchased of Vinaird 150,000 feet of gum and maple logs, and wanted Cruze to load same for him. The logs were to be delivered at the Du Poyster spur; Bodkin was to take the gum and maple logs at the spur; Cruze hauled a part of them, for which Vinaird paid him. He delivered at the spur 35,000 or 40,000 feet of the gum and maple logs. They were on the millyard at the time Bodkin killed himself. Bodkin informed the witness that he was to give Vinaird credit by the purchase price of the timber on a $2,000 note. Bodkin stated to this witness that Vinaird had bought the timber of him for $5,000, and he was taking timber for the first $2,000 note. He informed this witness that he had sold Vinaird the timber on the hill land.

To J. P. Edwards were propounded these questions, to which he answered:

"Q. About how many acres of timber land on the hills belonging to Joe B. DuPoyster and Don DuPoyster? A. I don't know, would be guess work.

"Q. Your best judgment? A. Something like 1,000 acres. * * *

"Q. I expect you are better acquainted with it than anybody else—what is your opinion as to the number of acres owned by them lying south of the Logan line? A. My opinion—something like, I say 1,500 acres.

"Q. In which tract? A. The bottom."

Vinaird was put upon the witness stand by the Bodkin estate, as upon cross-examination. He testified in detail as to the inspection of the timber, the agreed valuation of the timber on the bottom land, and the several values of the hill land, the sawmill, the cottage, the mill shed, the cypress boards, the bridge timber delivered to the county, the maple and gum logs delivered at the "spur"; also the lumber delivered "where Abernathy lives," and certain stacks of lumber. There were no objection filed to his testimony. Aside from this, the estate of Bodkin having placed him upon the stand constitutes a waiving of the right to object thereto. Arnold

et al. v. Cocanaugher et al., 170 Ky. 712, 186 S. W. 488.

Without more fully detailing the evidence, our summary of it is sufficient for the purpose of this opinion. The circuit court ascertained and determined that Bodkin did not own nor convey to Vinaird the title to the timber on the hill land, and abated the $6,000 note evidencing the contract price by $1,500. An examination and review of the evidence for ourselves convinces us the finding of the chancellor in respect to the title of Bodkin to timber on the hill land is abundantly sustained by it. And, since the evidence shows without contradiction the timber on the hill land was valued at $3,000 at the time of the execution and delivery of the writing, evidencing the sale, therefore to this amount Vinaird's note was and is without consideration, and the same should be credited therefor instead of the $1,500 allowed by the circuit court. The evidence showing Vinaird had not cut or removed any of the timber on the hill land and the agreed value thereof being $3,000, the depreciation in the market value thereof occurring between the date of the $6,000 note and the date of the decree should not be borne by Vinaird, but his $6,000 to Bodkin should be credited by the contract price of the timber on the hill land.

The evidence showing the mill shed was valued at $250 and the cottage at $200 is not contradicted; both located on the "hill land" and not owned by Bodkin. To the extent of the agreed value of these items, the $6,000 note was also without consideratio and likewise their total value should be credited on it.

It was competent for Vinaird to show the actual consideration of the $6,000 note (Piney Oil & Gas Co. v. Allen, 235 Ky. 767, 32 S. W. [2d] 325; Apple v. McCullough, 239 Ky. 74, 38 S. W. [2d] 955; Bullock v. Young, 252 Ky. 640, 67 S. W. [2d] 941), and, to the extent of no consideration, it should be canceled.

It is the accepted rule, where a note is based on a contract for the delivery of property or a sale thereof, the consideration fails where the delivery or title cannot be made. Streshley v. Powell, 12 B. Mon. 178; Holman v. Ky. Light & Power Co., 201 Ky. 267, 256 S. W. 409. The failure of consideration affects a recovery pro tanto. Baylor v. Morrison, 2 Bibb, 103; Stansberry v. Morgan, 6 T. B. Mon. 306.

Aside from this, it is not doubtful that Bodkin and

Vinaird included the agreed values of the hill land, the mill shed, and the cottage in the $6,000 note by mutual mistake. Plainly there was a mutual mistake of the parties, or there was no meeting of their minds in the making of the contract for the hill timber, the mill shed and the cottage, neither of which was at the time owned by Bodkin.

It is entirely unnecessary to determine whether the contract of sale and the $6,000 note are the products of either a mutual, or an unilateral, mistake, for in either case Vinaird is entitled to have the same rescinded or canceled to the extent of the agreed value of the timber on the hill land, the mill shed, and the cottage. Reiss v. Wintersmith, 241 Ky. 470, 44 S. W. (2d) 609; Fields v. Cornett et al., 254 Ky. 35, 70 S. W. (2d) 954, and cases cited.

The right of Vinaird to have corrected the $6,000 note and the contract evidencing the sale of the timber in so far as they embrace the timber on the hill land, the sawmill shed, and the cottage is within the principle so admirably expressed in Story's Equity Jurisprudence, sec. 1381; i. e.:

"Where the mistake is of so fundamental a character that the minds of the parties have never in fact met, or where an unconscionable advantage has been gained by mere mistake or misapprehension, and there was no gross negligence on the part of the plaintiff, either in falling into error or not sooner making redress, and no intervening rights have accrued and the parties may still be placed in statu quo, equity will interfere in its discretion to prevent intolerable injustice."

The same principle is aptly stated in a note to Hurst Motor Co. v. National Bond & Inv. Co., 96 Fla. 148, 117 So. 792, 59 A. L. R. 807. This court has often approved this principle. See Green et al. v. Collett, 231 Ky. 215, 21 S. W. (2d) 252; Miracle v. Stone, 190 Ky. 610, 227 S. W. 1011; Henderson v. Adams, 182 Ky. 280, 206 S. W. 461; McKibben v. Diltz, 138 Ky. 684, 128 S. W. 1082, 137 Am. St. Rep. 408; Bell v. Carroll, 212 Ky. 231, 278 S. W. 541; Board of Regents of Murray School v. Cole, 209 Ky. 761, 273 S. W. 508.

Appraising the developed facts by the principles reiterated, the agreed values of the hill land, the mill shed, and the cottage must be deducted from the $6,000

note, whether the same be regarded a failure of consideration, pro tanto, or their inclusion in it is the result of a mutual mistake of the parties, or an unilateral mistake as to Vinaird; in either case, Vinaird is entitled to have the note credited by the agreed values of these properties.

The judgment of the circuit court charged the estate of Bodkin $102 for a lot of boards delivered him by Vinaird, but refused to charge him with, and credit Vinaird by, the other items mentioned in the evidence. Of this action of the court Viniard complains.

The clause in the contract that "second party (Vinaird) shall not cut for Ike Bodkin, or on his account any timber except according to a written order containing the dimensions, number of feet and price per thousand, and which written order shall be signed by Ike Bodkin," was permitted by the trial court to control the right of Vinaird, and he refused to require Bodkin's estate to credit the logs and lumber for which Vinaird sought credit on the $6,000 note.

The evidence showing the delivery of logs, boards, and certain lumber, by Vinaird to Bodkin, is not disputed. The quoted clause of the contract is no defense to Vinaird's claim for the contract price of either the logs, boards, or the lumber.

The power to modify or rescind a pre-existing agreement is coextensive with the power to initiate it; either is an incident of contractual capacity. Jno. King Co. v. L. & N. R. Co., 131 Ky. 46, 114 S. W. 308; Homire v. Stratton & Terstegge Co., 157 Ky. 822, 164 S. W. 67; Murray v. Boyd, 165 Ky. 625, 177 S. W. 468; Wallace v. Cook, 190 Ky. 262, 227 S. W. 279; Covington & Anderson v. Melvin, 197 Ky. 573, 247 S. W. 714; Groce v. P. B. Yates M. Co. (Tex. Com. App.) 288 S. W. 161. This rule prevails, though the contract recites that no modification shall be made except in writing. Home Ins. Co. v. Gaddis, 3 Ky. Law Rep. 159; Continental Ins. Co. of City of N. Y. v. Simpson, 220 Ky. 167, 294 S. W. 1048.

In Elliott on Contracts, secs. 1987 and 1989, the following rules are thus in substance stated: That parties who have the right to make a contract have the power to unmake or modify, regardless of self-imposed limitations; that by subsequent agreement based upon a

sufficient consideration parties may modify their contract in any manner they choose; and that generally a new consideration is required in order for an attempted modification for a contract to be valid. Cassinelli v. Stacy, 238 Ky. 827, 38 S. W. (2d) 980, and cases cited.

The concurrent promises of the parties concerning the boards, logs, and lumber constitute a consideration bringing the case within the principles so well stated in Elliott on Contracts, which have often been approved by this court. Carter v. Hall, 191 Ky. 75, 229 S. W. 132; Bank of St. Helens v. Mann's Ex'r, 226 Ky. 381, 11 S. W. (2d) 144; Robbins v. Robbins, 246 Ky. 411, 55 S. W. (2d) 31.

Applying these principles and regarding the uncontradicted evidence establishing the agreement of Bodkin and Vinaird concerning the logs and lumber delivered by the latter at the ''DuPoyster spur'' and on the place ''where Abernathy lives,'' and certain other stacks of lumber, and the boards, described in the evidence, it is not doubtful Vinaird is entitled to a credit on the $6,000 note for the agreed price of the logs, boards, and lumber, notwithstanding the quoted clause in their contract, forbidding charging Bodkin with same except on a written order. The court allowed Vinaird a credit of $75 for timber cut on the hill land by the Kentucky Utilities Company with the authority of Bodkin. At the time Bodkin agreed for the timber to be cut by the utilities company, he was not the owner thereof, nor had he sold it to Vinaird, and, while the circuit court was in error in allowing Vinaird credit by $75 therefor, there being no cross-appeal, we are without authority to disturb it. Since the case must be reversed, we will not consume time or space to determine the items of credit for the logs, boards, and lumber to which Vinaird is entitled, but will leave the same for the trial court when parties and counsel may be present at the time of the allowing of these credits. The $6,000 will be credited by $3,000, the agreed value of the hill timber; $250, the agreed value of the mill shed; and $200, the agreed value of the cottage and also the contract price of the logs, boards, and lumber delivered by Vinaird as ascertained by the trial court.

Wherefore the judgment is reversed for proceedings consistent with this opinion.